Filed 7/31/14  P. v. Thomas CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065633 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FVA1200838) |
| BRYAN ROY THOMAS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Bernardino County, Ingrid Adamson Uhler, Judge.  Affirmed.

Torres & Torres and Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Bryan Roy Thomas guilty of murdering Elizabeth Benson and first degree residential burglary. The jury also found true that Thomas personally used a deadly and dangerous weapon, a knife, when he committed the murder. He appeals, contending: (1) the trial court erred by admitting evidence of incidents of violence against his fiancée, and (2) if defense counsel opened the door for the improper evidence or if the alleged error was not properly preserved, defense counsel rendered ineffective assistance. We find any error was not prejudicial and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*The Murder and Burglary*

On the evening of June 18, 2009, Benson visited with a neighbor at Benson's house. (Undesignated date references are to the year 2009.) The neighbor left around 9:00 p.m. Around 10:30 or 11:00 p.m. that night, Amanda Roby was working nearby Benson's home and heard a "blood curdling" scream coming from the direction of Benson's house.

The next morning, neighbors were concerned about Benson because her garage light was on and she had not picked up her newspaper. The neighbors went to Benson's house and entered using a key that Benson had given one of them. They found Benson lying on the bed covered in blood. Paramedics pronounced Benson dead at the scene. She had approximately 32 sharp force injuries, which were consistent with being stabbed with a knife.

The neighbors who found Benson observed that drawers in Benson's room were pulled open; a dish of jewelry was on the floor, and boxes in which Benson kept important papers were exposed on the floor. This was out of character for Benson because she was typically very clean and tidy. Officers discovered that two windows were open, their screens were cut, and there were blood stains on the sills. A homicide detective opined that the burglary was staged because the window screens were most likely cut from the inside. The attack likely took place in Benson's bedroom and then the perpetrator spread blood with his hands. Most of the blood stains were fingerprints with interlocking weave detail consistent with a fabric pair of gloves, which made it impossible to get sufficient ridge detail for identification.

*Thomas's Activity Around the Time of the Crimes*

In the afternoon on June 18, Thomas and his fiancée, Jennifer Cosper, had gone to Daniel McCormick's house, which was located 10 houses away from Benson's house. Thomas asked McCormick if he knew where Benson's grandson, Troy, was located. McCormick, knowing that Thomas was good friends with Troy, told Thomas they both knew Troy was incarcerated. Thomas replied, "Oh yeah, that's right." Thomas then said that he had left a phone number with Benson in case she needed anything and that he was going to check on her. Thomas then headed toward Benson's house.

According to Cosper, she and Thomas left McCormick's house, walked down the street and then went to a store. Around 4:30 or 5:00 p.m., they went to a motel in Fontana and "got high." Thereafter, they went to a house where Cosper was living at the time. Thomas left around 8:00 p.m. to sell $20 worth of "dope." When he left, Thomas

3

was wearing "a wife beater, slingshot type of shirt, . . . checkered shorts, and . . . black shoes." Cosper believed Thomas returned around 10:30 p.m. that night because after he got back, they played a dice game and then had just enough time to run into another store before it closed at 11:00 p.m. Cosper did not notice any change in Thomas's appearance.

After returning from the store, Cosper and Thomas played dice again and went to sleep around 1:30 to 2:00 a.m. When Cosper woke up around 9:30 a.m., Thomas was working in the backyard. Cosper did not know if Thomas left the house between the time she went to sleep and awoke in the morning.

Thomas's longtime friend, Martin Bocanegra, testified that Thomas came to his house between 9:00 and 11:00 a.m. on June 19. Thomas arrived in a truck with a man that Bocanegra had never met. Thomas was wearing a white T-shirt with a red substance on the stomach area. Bocanegra, who was "high" at the time, talked to Thomas who said, "I got into a fight with an old lady. I had to kick her ass. I had to fuck her up." When Bocanegra asked Thomas why he did it, Thomas replied "for some money." Bocanegra then asked Thomas if he had any money and Thomas said "no, she wouldn't tell [me] where it was."

Thomas asked Bocanegra if he could wash up at his house and Bocenegra told him he could in the backyard. When Thomas was washing up, Bocanegra noticed that Thomas had a knife. Thomas asked Bocanegra what he should do with the knife and Bocanegra instructed him to put it in the trash can. According to Bocanegra, Thomas's T-shirt and knife both went into the trash, which ultimately ended up at the dump. Bocanegra gave Thomas a shirt to wear and told him to leave.

4

When the police initially interviewed Bocanegra, he denied knowing anything. He claimed he did not provide the police with information because he did not want to get involved and was scared of dying. Bocanegra finally told the police what he knew in August 2010. At that time, Bocanegra said Thomas came to his house around 2:00 or 3:00 in the afternoon, had blood on his hands and shirt, and washed up in the front yard.

*Motive Evidence*

The prosecution presented evidence regarding money stored in Benson's home. Multiple people, including Benson's neighbors and another grandson knew that Benson kept approximately $6,000 hidden in her house, but all of the money was accounted for after her death. The prosecution also presented evidence that Benson's grandson, Troy, occasionally lived with Benson and called her his "B of A" bank. Before his incarceration, Troy had obtained large sums of money stealing circuit breakers and sometimes kept the money at Benson's house. Troy took money from a safe in Benson's garage while a person named John Johnson, who lived a block from Benson, waited in the car. Troy originally met Thomas through Johnson. However, Troy had not taken money from Benson's house in Thomas's presence.

Cosper testified that she had met Benson twice at Benson's house, once with Thomas, and the other time with Thomas and Troy. Troy also stated that Thomas had stopped by Benson's house when Troy was not there.

5

*The Investigation*

Before the police questioned him, Thomas told Cosper that he did not want the police to pin Benson's death on him. Cosper asked Thomas if he killed Benson, and Thomas responded that he did not.

Four days after the murder, Detective Chris Farmer called Thomas. Detective Farmer explained that he was calling because Thomas's name, along with Jackie, John and Troy, had come up in connection with a residential burglary and homicide. Thomas said he did not know any of those people. At one point during the conversation, Thomas inquired as to whether the victim had any knife wounds. Detective Farmer thought that was odd because at that point the police did not make public the cause of Benson's death.

Cosper was standing near Thomas in front of a house in Rialto when Thomas was speaking to Detective Farmer on the phone. Cosper heard Thomas tell Detective Farmer that he did not know Troy and that he was never in Rialto. Thomas told Cosper to tell anyone with questions about the murder that she did not know Benson or Troy.

At some point after Thomas got out of jail on a parole violation, he told Cosper "[i]f it was ever found out that I killed Grandma, I would have to PC up because they would kill me in prison." Cosper again asked if Thomas did it and Thomas replied, "[n]o." Cosper did not relay this information to police until her second interview with them. She claimed she lied to protect Thomas because she did not know if he had committed the crime.

In 2010, the police heard that Shelly Brown, who knew Thomas, Bocanegra, Troy, and Thomas's codefendant, Frank White, had information about the murder. Thus, a detective went to Brown's house to speak with her. Brown informed the detective that she had talked to Bocanegra several times about Thomas's involvement in Benson's murder. Brown agreed to wear a wire to record her conversations with Bocanegra. During one of those conversations, Bocanegra repeatedly said to Brown that Thomas came straight over to his house after the murder and washed up. Bocanegra also told Brown that Thomas said, "I got into it with this old lady man, I had to fuck her up. I kicked her ass."

A detective testified that they analyzed all necessary physical evidence from the scene of the crime but there was no physical evidence collected that placed Thomas or his codefendant at Benson's house.

DISCUSSION

I. *Alleged Evidentiary Error*

A. Background

During cross-examination, defense counsel elicited the following testimony from Cosper regarding her relationship with Thomas:

> "[Defense counsel:] There came a point in time in your relationship when things were not so good?
>
> "[Cosper:] Correct.
>
> "[Defense counsel:] Okay. Times were bad?
>
> "[Cosper:] Um, yes.

7

"[Defense counsel:]  Because something happened?

"[Cosper:]  Yes.

"[Defense counsel:]  Another woman?

"[Cosper:]  Actually, that didn't happen until after things started to go bad.

"[Defense counsel:]  And that hurt you?

"[Cosper:]  His actions hurt me from the time of the murder, the way he started changing with his aggression, and then came the other woman.

"[¶] . . . [¶]

"[Defense counsel:] And up until this time, [Thomas] had been good to you?

"[Cosper:]  Yeah.  Up until the murder, yes.

"[Defense counsel:]  And he was—had a good personality?

"[Cosper:]  Uh-huh.

"[Defense counsel:]  Nothing —

"[Cosper:]  Yes.

"[Defense counsel:] — Violent?  Nothing violent about him?

"[Cosper:]  Not at all."

The prosecutor then conducted a redirect examination:

"[Prosecutor:]  Mrs. Cosper, on cross-examination you were asked questions about whether or not [Thomas] had been violent or you know him to be violent or not.  Do you remember that?

"[Cosper:]  Yes.

"[Prosecutor:]  You testified he had not been violent?

8

"[Cosper:] Not at that point in time before the murder, no.

"[Prosector:] At some point in time did that change?

"[Cosper:] Yes, after we moved into the studio.

"[Prosecutor:] And what happened on that occasion?

"[Cosper:] Um —

"[Defense counsel:] Objection. Relevance.

"[The Court:] It's overruled based on your cross-examination. [¶] You may answer.

"[Cosper:] He broke my car window out through the passenger side and it cut my lip. And he stood over me when I was on the bed on his birthday after he sliced my tire with two knives and I told him to go ahead and do it and he put them away.

"[Prosecutor:] Did those incidents happen before or after you heard [Thomas] say, 'if they ever found out I killed Grandma?'

"[Cosper:] After."

B. Analysis

Thomas argues the trial court erred by admitting evidence of incidents of violence against Cosper. Specifically, he contends the evidence should not have been admitted because defense counsel did not elicit character evidence from Cosper, the testimony was irrelevant and improper specific act testimony under Evidence Code section 1102, and the testimony was prejudicial under Evidence Code section 352. (Undesignated statutory references are to the Evidence Code.) Lastly, he argues admission of the testimony resulted in a due process violation. We reject these arguments.

9

Generally, evidence of a defendant's character or a trait of his character is not admissible to prove the defendant's conduct on a specific occasion (§§ 1101, subd. (a), 1102). However, when a defendant presents testimony of his good character at trial, the prosecution may impeach the testimony or rebut it. (§ 1102, subd. (b).) Under section 1102, subdivision (a), "[a] defendant may introduce opinion evidence of his or her character to show a nondisposition to commit an offense." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1118.) "Lay opinion testimony is admissible under section 1102 when it is based on the witness's personal observation of the defendant's course of behavior." (*People v. Felix* (1999) 70 Cal.App.4th 426, 430.)

It follows that "when a criminal defendant presents opinion or reputation evidence on his own behalf[,] the prosecutor may present like evidence to rebut the defendant's evidence and show a likelihood of guilt." (*People v. Hempstead* (1983) 148 Cal.App.3d 949, 953.) "[E]vidence of specific acts of the accused [is], as a general rule, inadmissible to prove his disposition to commit such acts [citation]; this general rule is applicable 'even though the defendant has opened the question by introducing evidence of his good character.' " (*People v. Wagner* (1975) 13 Cal.3d 612, 619 (*Wagner*).) "The [general] rule, precluding the admission into evidence of specific acts of conduct to show defendant's bad moral character must, of course, be distinguished from the cross-examination of a *reputation witness*. When a defense witness, other than the defendant himself, has testified to the reputation of the accused, the prosecution may inquire of the witness whether he has heard of acts or conduct by the defendant inconsistent with the witness' testimony. [Citations.] In asking such questions, the prosecutor must act in

10

good faith and with the belief that the acts or conduct specified actually took place. [Citations.] The rationale allowing the prosecution to ask such questions (in a 'have you heard' form) is that they test the witness' knowledge of the defendant's reputation." (*Ibid.*) " '[T]he price a defendant must pay for attempting to prove his good name is to throw open a vast subject which the law has kept closed to shield him.' " (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 357.)

If the impeachment or rebuttal of good character evidence "would create a substantial danger of undue prejudice to the defendant, the trial judge has the discretion to preclude [the evidence] under . . . section 352." (*People v. Hempstead*, *supra*, 148 Cal.App.3d at p. 954.) " 'The prejudice referred to in . . . section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, prejudicial is not synonymous with damaging.' " (*People v. Felix* (1994) 23 Cal.App.4th 1385, 1396.)

We review a trial court's evidentiary rulings under sections 352, 1101 and 1102 for abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

Thomas only objected to the challenged evidence on the basis of relevance. Thus, he forfeited his claim that the trial court admitted the evidence in violation of sections 352, 1101 and 1102. (*People v. Doolin*, *supra*, 45 Cal.4th at p. 437; *People v. Barnett* (1998) 17 Cal.4th 1044, 1130.) In any event, we reject his arguments.

11

Here, based on our review of the record, defense counsel's examination of Cosper served two distinct purposes. The first was to establish that Cosper may have been biased against Thomas due to his relationship with another woman. Based on Cosper's answers, defense counsel delved into whether Thomas was a nonviolent person. Through this second aspect, Thomas placed his character for violence at issue. Because Thomas opened the character issue, the prosecutor was entitled under section 1102 to test Cosper's knowledge of Thomas's reputation for violence. (*Wagner*, *supra*, 13 Cal.3d at p. 619.) In this case, however, the prosecutor did not elicit evidence of Thomas's character "in the form of an opinion or evidence of his reputation" (§ 1102). Instead, the prosecutor asked about instances of violence by Thomas against Cosper. Specifically, the prosecutor elicited testimony that Thomas broke Cosper's car window on one occasion and, at another point, stood over her with two knives. Evidence of specific acts is inadmissible under section 1101. (*Wagner*, at p. 619.) Although the trial court abused its discretion in admitting this evidence, we conclude that the admission of this evidence was harmless in the context of the entire trial.

In discussing the standard of prejudice this court should apply to the admission of Cosper's testimony about Thomas's violent acts against her, Thomas contends that the error is of constitutional scope because it violated his right to due process. Thomas argues that the harmless beyond a reasonable doubt standard announced in *Chapman v. California* (1967) 386 U.S. 18, 24 is thus the appropriate standard to apply in this situation. Because we do not view the admission of this character evidence as having rendered Thomas's trial fundamentally unfair, we apply the standard for assessing

12

prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818. (See *People v. Malone* (1988) 47 Cal.3d 1, 22.) Under this standard, we do not reverse unless it is reasonably probable that Thomas would have obtained a more favorable outcome if the challenged evidence had been excluded. (*Watson*, at p. 836.) We conclude there is no reasonable probability that Thomas would have received a more favorable outcome if the court had excluded Cosper's testimony that Thomas broke her car window and stood over her with two knives.

Thomas argues the evidence against him was "razor thin" and suggests the jury could have rendered a different result because "no physical evidence tied him to the case and the timeline strongly suggests it could not possibly have been him." Although there were some discrepancies in the evidence, such as Roby's testimony that she heard a scream around 10:30 or 11:00 p.m. on June 18, while Bocanegra testified that Thomas came to his house to clean up between 9:00 and 11:00 a.m. on June 19, the jury was free to weigh those inconsistencies in the context of each witness's full testimony. Moreover, there was substantial evidence of Thomas's guilt. Multiple witnesses testified that Thomas made incriminating statements after the murder. For example, when Thomas was washing up at Bocanegra's house, he said "I got into a fight with an old lady. I had to kick her ass. I had to fuck her up." Bocanegra relayed Thomas's involvement in the crime and his incriminating statements to Brown. Thomas also told Cosper, "if it was ever found out that I killed Grandma, I would have to PC up because they would kill me in prison."

In addition to his incriminating statements, Thomas lied to the police by stating he did not know Troy and that he was never in Rialto. Thomas also asked Cosper to lie for him by telling anyone with questions about the murder that she did not know Benson or Troy. Further, even though the police had not released Benson's cause of death, Bocanegra testified that he saw Thomas dispose of a knife and Thomas inquired to Detective Farmer if Benson had knife wounds.

Based on evidence of Thomas's incriminating statements and conduct after the crime, we are confident that it is not reasonably probable Thomas would have received a more favorable result if the trial court had not admitted Cosper's testimony about Thomas's violent conduct, even in view of its prejudicial nature.

## II.  *Alleged Ineffective Assistance*

Thomas argues if defense counsel opened the door for the improper evidence or if the alleged error was not properly preserved, defense counsel rendered ineffective assistance. We reject this argument.

In making a claim of ineffective assistance of counsel, a defendant has the burden on appeal to prove by a preponderance of the evidence that: (1) his or her counsel's representation fell below an objective standard of reasonableness under prevailing professional norms; and (2) defendant suffered prejudice from that deficient performance, i.e., it is reasonably probable that he or she would have received a more favorable outcome had counsel's performance not been deficient. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688; *People v. Osband* (1996) 13 Cal.4th 622, 700; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.)  If a defendant does not show the required prejudice, an

14

appellate court need not address the remaining issue of whether counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. (*Hill v. Lockhart* (1985) 474 U.S. 52, 60 ["We find it unnecessary to determine whether there may be circumstances under which erroneous advice by counsel as to parole eligibility may be deemed ineffective assistance of counsel, because in the present case we conclude that petitioner's allegations are insufficient to satisfy the . . . requirement of 'prejudice.' "]; *People v. Kipp* (1998) 18 Cal.4th 349, 367.) Furthermore, if counsel's act or omission is not explained in the record, the ineffective assistance claim is more appropriately addressed in a habeas corpus proceeding unless counsel was asked for an explanation and failed to provide one or unless there could be no satisfactory explanation. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267; *People v. Diaz* (1992) 3 Cal.4th 495, 557-558.)

Here, counsel's acts or omissions are not explained in the record. We can infer that counsel questioned Cosper about her experience with Thomas to expose her potential bias; however, we need not address whether Thomas's counsel performed deficiently by either opening the door for the improper evidence or not properly preserving objections to that evidence because Thomas has not carried his burden on appeal to show prejudicial error. As we already discussed, it is not reasonably probable that Thomas would have received a more favorable outcome if the trial court had not admitted Cosper's testimony about Thomas's violent conduct (part I, *ante*). Without a showing of prejudicial error, we need not consider whether Thomas's counsel's representation fell below an objective standard of reasonableness and deny Thomas's ineffective assistance claim.

DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:

HALLER, Acting P. J.

McDONALD, J.